**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Action No. 6:21-CR-00119-2 |
| | § | |
| **JIMENEZ JAMES LOVE** | § | |

## MEMORANDUM OPINION AND ORDER

Defendant Jimenez Love is under indictment for conspiring to possess and distribute methamphetamine and fentanyl.[1] (Dkt. No. 149). Before the Court is Defendant's Opposed Motion to Suppress Evidence. (Dkt. No. 133). The Government filed its Response, (Dkt. No. 25), and the Court held an evidentiary hearing, (*see* Dkt. Nos. 179, 181). After reviewing the Motion, the Response, the record, and the applicable law, the Court **DENIES** the Motion.

**I.    BACKGROUND**

On June 30, 2021, at 7:20 p.m., Texas Department of Public Safety ("DPS") Special Agent Richard Russell informed DPS Trooper Ernest Ruiz that a suspected narcotics courier was traveling through San Patricio County in a Toyota Rav4 with other vehicles. (Dkt. No. 181 at 10–12, 29). Russell asked Ruiz to conduct a traffic stop if probable cause could be established in order to identify the person in the vehicle. (*Id.* at 11–12).

Less than an hour later, Ruiz spotted the Rav4 traveling with a black Nissan. (*Id.* at 13–14). He followed both vehicles and Ruiz observed the Nissan following the Rav4 too closely. (*Id.*). In fact, Tyler Roy, a patrol deputy with the Refugio County Sheriff's

---

[1] 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A).

Office, was attempting to pull the Rav4 over for a traffic stop, and he struggled to merge between the two cars. (*Id.* at 15, 41–42); (Dkt. No. 176 at 1, 1:06–1:15). When Roy finally pulled in behind the Rav4 and flashed his lights, the Nissan abruptly changed lanes, forcing a white van to brake to avoid a collision. (Dkt. No. 181 at 15–16); (Dkt. No. 176 at 1, 1:38–1:42).

Ruiz stopped the Nissan and informed the driver, Love, that he was being pulled over for following too closely and making an unsafe lane change. (Dkt. No. 176 at 2, 1:33–1:42). Ruiz noticed that Love's eyes appeared glazed and asked if he was tired or had been drinking. (*Id.* at 1:43–1:55); (*see also* Dkt. 181 at 14) (Ruiz testifying that Love was driving approximately 60 miles per hour in a 75 mile per hour zone). Love responded that he had an ulcer in his eye, had not been drinking, and was about to stop for food and rest soon. (Dkt. No. 176 at 2, 1:46–2:11). Ruiz asked for Love's driver's license and proof of insurance. (*Id.* at 2, 2:12–2:15, 2:44–2:45).

Love did not have his driver's license with him but provided a passport, explaining that he had lost his driver's license and was having trouble getting a new one because of outstanding fines for speeding tickets. (*Id.* at 2, 2:14–2:43). Love also had no proof of insurance but named an insurance carrier for the car, which he said belonged to his wife. (*Id.* at 2, 2:46–3:40). When asked where the license was issued, Love said Harlingen, Texas, but admitted that he did not know the number because he had previously lived in Colorado. (*Id.* at 2, 3:41–3:56). He clarified that he had been back in Texas for almost four years and that it was a Texas license. (*Id.* at 2, 4:00–4:09).

2

Ruiz asked Love whether his license was suspended. (*Id.* at 2, 4:10–4:12). Love confidently replied that it was not. (*Id.* at 2, 4:13–4:15). Love explained that he had received a speeding ticket and, when he went to court, he could not pay the fine because the ticket had not been processed. (*Id.* at 2, 4:16–4:27). He added that he had missed a later court date, resulting in a failure-to-appear warrant that prevented him from renewing his license. (*Id.* at 2, 4:28-4:45). When asked if he had any outstanding warrants, Love said no, explaining that he had resolved the failure-to-appear warrant. (*Id.* at 2, 4:57–5:06). Ruiz pressed on why, if there were no active warrants, Love still lacked a license. (*Id.* at 2, 5:07–5:13). Love answered that the last time he tried to renew it, the warrant had not yet been cleared, but he now expected to be able to get it once he paid off the fines. (*Id.* at 2, 5:14–5:24).

Ruiz asked Love to get out of the car, and Love complied. (*Id.* at 2, 5:25–5:40). Ruiz confirmed the address on Love's license, and Love offered two possible addresses in Harlingen. (*Id.* at 2, 5:41–6:02). Ruiz double-checked Love's information, verifying the Texas license, addresses, and insurance provider. (*Id.* at 2, 6:03–6:43).

When asked where he was going, Love said that he was going to Houston to see the nightlife. (*Id.* at 2, 6:44–6:57). He estimated that he would stay "probably a couple of days." (*Id.* at 2, 6:58–7:06). This prompted Ruiz to ask why Love's wife—the car's owner—was not with him. (*Id.* at 2, 7:06–7:08). Love explained that she had to work. (*Id.* at 2, 7:09–7:12). Ruiz probed further into her absence. (*Id.* at 2, 7:13–7:18, 7:27–7:33). Love stated that she knew he had the car, that their relationship was good, and that she preferred to stay home while studying to become a pharmacy technician. (*Id.* at 2, 7:29–

3

7:33, 7:36–8:05). Love confirmed that his wife was the car's sole owner. (*Id.* at 2, 8:06–8:12).

Ruiz then asked Love if there was anything illegal in the vehicle, such as marijuana, cocaine, methamphetamine, or fentanyl. (*Id.* at 2, 8:13–8:22). Love shook his head and said "no" to each. (*Id.*). When Ruiz asked for permission to search the vehicle, (*id.* at 2, 8:23–8:24), Love—who had been chatty until then—got quiet, looked down, and replied that he did not think he could give consent because it was not his car, (*id.* at 2, 8:25–8:36). Ruiz explained that as the driver, Love had care, custody, and control of the car and asked again. (*Id.* at 2, 8:37–8:40). Love answered indirectly, saying that Ruiz would find only beer. (*Id.* at 2, 8:41–8:45). Ruiz asked again if Love had been drinking. (*Id.* at 2, 8:41–8:47). At first, Love said no, but then changed his answer to yes, explaining that he had been drinking much earlier. (*Id.* at 2, 8:48–8:59). Ruiz again requested consent to search the vehicle. (*Id.* at 2, 9:00–9:01). Love paused, looked down, and said, "Yeah, I guess so." (*Id.* at 2, 9:02–9:05). About seven minutes had passed between the initial stop and Love's consent. (*See id.* at 2, 1:33–9:05).

Ruiz ran a license and registration check while briefing Russell, who said that he was en route. (*Id.* at 2, 9:06–10:50). Ruiz printed a written warning, exited his patrol car, and began searching the Nissan. (*Id.* at 2, 10:51–14:13). Ruiz searched the car's interior and trunk for about 15 minutes before Russell and another agent arrived. (*Id.* 2, 14:14–29:00). Russell accessed the car's fuel tank, where he saw several vacuum-sealed bundles that appeared to be narcotics. (*Id.* at 2, 36:24); (*see also id.* at 2, 43:50–43:55) (showing about ten packages removed from the fuel tank). At that point, Love was handcuffed and

4

placed under arrest. (*Id.* at 2, 36:35). Ultimately, 25 bundles containing methamphetamine and fentanyl were recovered. (Dkt. No. 25 at 5).

On August 17, 2023, Love moved to suppress all evidence and statements from the June 30, 2021, traffic stop. (Dkt. No. 133 at 1). The Court held an evidentiary hearing on February 1, 2024. (*See* Dkt. Nos. 179, 181). The Government presented testimony from Ruiz, Roy, and Russell. (Dkt. No. 181 at 10–56). The Government also offered six exhibits, which were admitted into evidence. The first two exhibits were video footage: the first from the dash cam of Ruiz's patrol unit, and the second from his body-worn-camera. (Dkt. No. 176 at 1–2). The third exhibit was the written warning Ruiz issued to Love for his traffic violations. (*Id.* at 3). The fourth and fifth exhibits were excerpts from the Texas Driver Handbook and the Texas Transportation Code, respectively, explaining mandatory and recommended following distances while driving. (*Id.* at 4–5). Finally, the sixth exhibit was a medical summary of Love's medications taken on the day of the hearing. (*Id.* at 6).

## II. ANALYSIS

### A. TRAFFIC STOP

The Fourth Amendment bars "unreasonable searches and seizures." U.S. Const. amend. IV. That protection extends to "seizures of the person, including brief investigatory stops such as the stop of the vehicle here." *United States v. Alkheqani*, 78 F.4th 707, 716 (5th Cir. 2023) (quoting *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017)).

To justify a traffic stop, an officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Broca-Martinez*, 855 F.3d at 678 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). This "'reasonable suspicion' exists 'when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure.'" *Alkheqani*, 78 F.4th at 716 (citation modified) (quoting *Broca-Martinez*, 855 F.3d at 678).

The reasonable-suspicion standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Thomas*, 997 F.3d 603, 610 (5th Cir. 2021) (quoting *Kansas v. Glover*, 589 U.S. 376, 380, 140 S.Ct. 1183, 1187, 206 L.Ed.2d 412 (2020)). It "permit[s] officers to make commonsense judgments" based on the aggregation of behavior, even when individual actions might have innocent explanations. *Id.* (alteration in original) (first quoting *Kansas*, 589 U.S. at 380–81, 140 S.Ct. at 1188; then quoting *Navarette v. California*, 572 U.S. 393, 403, 134 S.Ct. 1683, 1691, 188 L.Ed.2d 680 (2014); and then citing *United States v. Arvizu*, 534 U.S. 266, 277–78, 122 S.Ct. 744, 752–53, 151 L.Ed.2d 740 (2002)). Courts must consider "the totality of the circumstances—the whole picture." *Id.* (quoting *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695).

1. **Lawfulness of Initial Stop**

Love argues that Ruiz lacked any basis to pull him over and that the stop was unlawful from the outset. (Dkt. No. 133 at 3); (Dkt. No. 181 at 4, 60). The Court disagrees.

6

"The Fourth Amendment requires a traffic stop to be justified when it begins," and any later actions must remain "reasonably related in scope to the circumstances that justified the stop." *United States v. Walker*, 49 F.4th 903, 906–07 (5th Cir. 2022) (quoting *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc)). "A traffic stop is justified at its inception when an officer has 'an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.'" *Id.* at 907 (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). Given that "reasonable suspicion is a low threshold," "probable cause to believe that a traffic violation has occurred" necessarily establishes "reasonable suspicion to stop the vehicle." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996)).

Ruiz stopped Love and issued a warning for two traffic violations: following too closely and making an unsafe lane change.[2] (Dkt. No. 176 at 3). Dash cam footage shows Love's Nissan driving less than a car length behind the vehicle in front of him and cutting off a white van when changing lanes. (*Id.* at 1, 1:06–1:15, 1:38–1:42). The police car attempting to stop the Rav4 could not even get into the lane because of how closely Love was following. (*Id.* at 1, 1:06–1:15). And the van had to brake to avoid a collision when Love changed lanes. (*Id.* at 1, 1:38–1:42).

The Government introduced an excerpt from the Texas Driver Handbook explaining that following too closely is unsafe and a copy of the Texas Transportation

---

[2] The warning also cited Love for failing to display a driver's license, (Dkt. No 176 at 3), but that violation occurred after Ruiz initiated the stop and cannot serve as a basis for it.

7

Code provision making it a traffic offense. (*Id.* at 4–5). Ruiz's written warning cites the statutory sections for both violations. (Dkt. No. 176 at 3) (first citing Tex. Transp. Code § 545.062(a); and then citing *id.* § 545.060(a)(2)). Taken together, the evidence shows that Ruiz had not only reasonable suspicion but probable cause to stop Love for traffic violations. Accordingly, the stop was justified at its inception.[3]

### 2. Length of Stop

Love next argues that Ruiz unlawfully prolonged the stop by asking about his travel plans instead of limiting the encounter to issuing a ticket or warning. (Dkt. No. 133 at 3–4); (Dkt. No. 181 at 4, 60–62). He urges that a traffic stop is a seizure that may only last as long as necessary to address the traffic violation, and authority for the seizure ends once that task is, or reasonably should be, completed. (Dkt. No. 133 at 3). Because Ruiz asked questions unrelated to the reason he was stopped, Love argues, the encounter became an unlawful seizure. (*Id.* at 3–4). The Court disagrees.

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160

---

[3] To the extent Love argues that the stop was invalid because Ruiz pulled him over only because of the tip from Russell about narcotics, "it is well-settled that a traffic stop, even if pretextual, does not violate the Fourth Amendment if the officer making the stop has probable cause or reasonable suspicion to believe that a traffic violation has occurred." *United States v. Cedillo*, 855 F.App'x 954, 955 (5th Cir. 2021) (per curiam) (citing *Whren*, 517 U.S. at 810–12, 116 S.Ct. at 1772–73). Ruiz personally observed traffic violations that provided a lawful basis to stop Love, regardless of any parallel investigative purpose.

L.Ed.2d 842 (2005)). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 684, 105 S.Ct. 1568, 1574, 84 L.Ed.2d 605 (1985)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

But an officer's mission when addressing a traffic violation includes more than deciding "whether to issue a traffic ticket." *Id.* at 355, 135 S.Ct. at 1615. It also "includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (alteration in original) (quoting *Caballes*, 543 U.S. at 408, 125 S.Ct. at 837). An officer "also may question a vehicle's occupants about the purpose and itinerary of their trip." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011).

Officers may also "ask questions unrelated to the purpose of the stop while waiting for computer checks to process," provided they "diligently pursue the investigation of the traffic violation." *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020) (per curiam) (citing *Rodriguez*, 575 U.S. at 354, 135 S.Ct. at 1614). "The Fourth Amendment tolerates additional investigation unrelated to the safe and responsible operation of the vehicle only if that investigation does not lengthen the driver's detention or is supported by reasonable suspicion of additional criminal activity." *Id.* (citing *Rodriguez*, 575 U.S. at 354–55, 135 S.Ct. at 1614–15). "If the officer develops reasonable suspicion of such activity 'in the course of the stop and before the initial purpose of the

stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.'" *Id.* at 487–88 (quoting *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)). To be clear, however, "[l]aw enforcement must possess reasonable suspicion before extending a stop by asking unrelated questions." *Macias*, 658 F.3d at 522.

*Reyes* is instructive. There, the Fifth Circuit upheld the denial of a motion to suppress where an officer prolonged a stop and discovered narcotics. *Reyes*, 963 F.3d at 485–86, 488–91. The court emphasized the officer's "articulable facts," including the defendant's "implausible" travel story, use of a vehicle registered to someone else, and demeanor when asked about contraband. *Id.* at 488–89. "Additionally, [the officer] drew on his training, education, and experience in narcotics interdiction, and his familiarity with the area, to surmise from those facts his suspicion that [the defendant] was participating in a crime." *Id.* at 489. The Fifth Circuit held that those "articulable facts," when "taken together with rational inferences from those facts," *id.* at 488 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)), "combine[d] to establish reasonable suspicion," *id.* at 489.

Similar circumstances are present here. Ruiz knew that a suspected drug trafficker was in the Rav4 that Love's Nissan was closely following. (*See* Dkt. No. 181 at 11–14). Love was driving a car that was not registered to him. (*See* Dkt. No. 176 at 2, 2:46–3:40). His travel story—that he was taking an open-ended midweek trip to see Houston's nightlife—was unusual. (*See id.* at 2, 6:47–7:26). He had no driver's license, admitted to multiple unpaid traffic violations, (*see id.* at 2, 2:14–2:43), and raised concerns about

10

whether there were outstanding warrants for his arrest, (*see id.* at 2, 4:16–5:24). All of these topics were directly related to the traffic investigation and therefore did not impermissibly extend the stop.

Ruiz's questions about Love's wife, while not squarely related to the traffic violations, were natural follow-ups to Love's answers about the car's ownership and his travel plans. They also arose from Ruiz's reasonable suspicion that another crime might be taking place. That suspicion was based on the unusual combination of Love driving his wife's car, his open-ended itinerary, and his midweek departure. (*See* Dkt. No. 181 at 35–36). As Ruiz testified, he "asked those questions just to get an idea of if there [were] any other criminal offenses [because he] didn't know if [Love] was involved in a domestic [dispute or] had taken the vehicle without anyone knowing." (*Id.* at 36).

Viewed under the totality of the circumstances, these articulable facts—while they may be innocuous in isolation—combined to create reasonable suspicion that justified briefly extending the stop. The traffic stop lasted just over seven minutes from the initial pull-over to Love's consent to search. (*See* Dkt. No. 176 at 2, 1:33–9:05). That duration was not unlawfully extended.

B.   **MIRANDA WARNINGS**

Finally, Love moves to suppress any incriminating statements he made during the stop, arguing that he was not given *Miranda* warnings.[4] (Dkt. No. 133 at 4–5); (Dkt. No. 181 at 64:9–65:25). He contends that he was detained once the stop was extended without

---

[4]   *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

11

reasonable suspicion, and *Miranda* warnings were required as a result. (Dkt. No. 181 at 65:14–65:25).

The Court has already found that the stop and its brief extension were supported by reasonable suspicion. *See supra* Section II(A). Love was therefore not impermissibly detained during his conversation with Ruiz or the subsequent search of his vehicle. And in any case, "a person detained in a routine traffic stop is not 'in custody' for *Miranda* purposes." *Reyes*, 963 F.3d at 490 (citing *Berkemer v. McCarty*, 468 U.S. 420, 437–40, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984)). *Miranda* applies only once "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Id.* (quoting *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150).

In sum, because the traffic stop was supported by reasonable suspicion and Love was not yet under formal arrest, the Court finds that suppression of any statements Love made during the traffic stop is not warranted.

### III.   CONCLUSION

Because the traffic stop and search were supported by reasonable suspicion, the Court **DENIES** the Motion.

It is SO ORDERED.

Signed on July 31, 2025.

                                            *(signature)*
                                           **DREW B. TIPTON**
                                     **UNITED STATES DISTRICT JUDGE**